# BAKER BOTTS LLP

30 ROCKEFELLER PLAZA
NEW YORK, NEW YORK
10112-4498

TEL +1 212.408.2500
FAX +1 212.408.2501
www.bakerbotts.com

ABU DHABI
AUSTIN
BEIJING
DALLAS
DUBAI
HONG KONG
HOUSTON
LONDON
MOSCOW
**NEW YORK**
PALO ALTO
RIYADH
WASHINGTON

January 20, 2012

080829.0102

The Honorable John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

W. Zachary Hughes
TEL +1 212.408.2504
FAX +1 212.259.2504
zach.hughes@bakerbotts.com

Re:  Case # 1:11-cv-3656; *Thomas v. Mortgage Electronic Registration Systems, Inc., et al*; in the United States District Court for the Eastern District of New York

Dear Judge Gleeson:

Pursuant to this Court's Motion Practices Rule 2.A., Defendants Dolan Media Company, American Processing Company, NDeX, and NDeX West LLC (collectively, "Dolan Media") submit this pre-motion conference request.[1]  Dolan Media intends to file motions to dismiss the above-reference complaint under Federal Rules of Civil Procedure ("FRCP") 12(b)(1), 12(b)(3), and 12(b)(6).

## Procedural Background

For the third time and in the third jurisdiction, Plaintiff Elizabeth Thomas has brought suit against Dolan Media and a host of other defendants alleging claims of illegal practices in the home foreclosure industry.  Thomas' first two attempts to assert these claims were dismissed, and Thomas' latest complaint should reach a similar fate.

In January 2011, Thomas filed a lawsuit in the Southern District of Texas,[2] which was Thomas' then-current place of residence and the location of her home that had been subject to foreclosure.  Thomas' complaint was styled as a putative class action, and it asserted the same basic claims against the same basic group of defendants as are present in this case.  NDeX West LLC filed a Motion to Dismiss on various grounds.  Several days after NDeX West LLC filed its motion, Thomas moved to voluntarily dismiss her case.  On April 28, 2011, the district court granted Thomas' motion, dismissing Thomas' case without prejudice.  (*See* Exhibit A.)

In February 2011, while her case in the Southern District of Texas was still pending, Thomas filed an adversary proceeding containing similar allegations in her Chapter 7 bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of

---

[1]  As indicated in Magistrate Levy's January 11, 2012 Minute Entry, Plaintiff is currently proceeding *pro se*. But at the initial conference she expressed her intent to obtain legal counsel.  To date, no counsel has made an appearance on behalf of the Plaintiff.  Nonetheless, Magistrate Levy advised the Defendants that the Court's pre-motion conference request procedure should be followed given Plaintiff's stated intent to obtain legal counsel.

[2]  *Elizabeth Thomas v. Merscorp Inc., et al.*, Case No. 10-4320, in the United States District Court for the Southern District of Texas.

Texas.[3] Dolan Media moved to dismiss the adversary proceeding, which the Bankruptcy Court did on April 28, 2011. The Bankruptcy Court found that it lacked subject matter jurisdiction because the adversary proceeding did not arise under or relate to the Chapter 7 case (which was closed), nor did it arise under the Bankruptcy Code. (*See* Exhibit B.) Thomas initially moved to reopen her Chapter 7 case in an attempt to revive the adversary proceeding, but she later withdrew her motion on the eve of a hearing on the matter. (*See* Exhibit C.)

In July 2011, Thomas filed her third lawsuit against most of the same defendants alleging most of the same allegations, but this time changed the venue to the Eastern District of New York (the "Complaint"). The Complaint contains more than 500 paragraphs, covering more than 100 pages, and includes sixteen causes of action. Once again, Thomas generally condemns the mortgage and foreclose process and claims that Dolan Media assisted in providing faulty documentation for mortgages.

**Dolan Media's Motion to Dismiss the Complaint**

Thomas' case must be dismissed for multiple reasons. First, the Complaint fails under FRCP 8 and the U.S. Supreme Court precedent interpreting Rule 8's pleading requirements. Despite its length, the Complaint lacks the requisite factual content beyond mere legal conclusions to "nudge [her] claims ... across the line from conceivable to plausible." *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1952 (2009). As such, the Complaint fails to state a claim upon which relief can be granted, and must be dismissed under FRCP 12(b)(6). Moreover, the Complaint contains several claims that must be dismissed because they are not recognized private causes of action.[4]

Second, Thomas has no standing to bring any of her asserted causes of action because the Complaint identifies no "injury in fact" to her as a result of the defendants' alleged conduct. At the January 10, 2012 initial conference, Thomas confirmed: "This litigation is not about my home. This – I'm not coming to the Court, asking the Court to make any decisions of whether they take that house or not. It's not relevant to me any longer at this point..." (Exhibit D at 6:10-14.) Instead, her Complaint focuses on policing the conduct of the defendants and correcting what she perceives as improper foreclosure procedures.[5] But "the 'injury in fact' test

---

[3]     *In re Elizabeth Thomas*, Case No. 10-40785-H3-7, in the United States Bankruptcy Court for the Southern District of Texas; *Thomas v. Dolan Media, et al.*, Adversary No. 11-03090.

[4]     The alleged counts in the Complaint for which there is no recognized private cause of action include: (a) The false "Transfer" of Rights in the Property (Count 2); (b) Filing Fraudulent and Illegal Liens (Count 3); (c) Contempt of the Bankruptcy Code (Count 8); (d) Contempt of Federal Rules of Bankruptcy Procedure (Count 9); (e) Unauthorized Practice of Law (Count 10); (f) Abuse of the Bankruptcy Process (Count 11); (g) Fraud on the Court (Count 12); (h) Conspiracy to Commit Wrongful Foreclosure by the Creation, Operation, and Use of the MERS System and fraudulent documents (Count 13); (i) Money Laundering (Count 14); and (j) Violating Due Process and Civil Rights with Threats (Count 15).

[5]     "Whether a loan is in default or not is not the issue. It's whether or not a lawyer can go and make his own documents and use his – and allow someone to use his license to make these documents....So, I mean there's a lot of allegations here in my complaint – but the most important one focuses on they went to the United States Patent and Trademark Commission and to a copyright and they made up their own procedures for foreclosure." (Ex. D at 7:24 – 8:2; 11:20 – 12:1.)

requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 2137 (1992). The Complaint identifies no such injury to Thomas.[6]

Third, even if Thomas amended the Complaint to allege an injury based on the foreclosure of her Texas home, the Complaint would still have to be dismissed under FRCP 12(b)(1) because this Court would lack subject matter jurisdiction over such a dispute. Thomas would, in effect, be asking this Court to review the actions of the Texas state court foreclosure proceedings, which is prohibited under the *Rooker-Feldman* doctrine.

Fourth, the Complaint should be dismissed under the doctrine of judicial estoppel. Thomas filed for bankruptcy in December 2010. However, Thomas failed to disclose any of the alleged causes of action or potential claims to damages in her bankruptcy proceedings. Because the bankruptcy court relied on Thomas' failure to disclose these alleged assets when the court granted her a discharge in March 2011, Thomas is judicially estopped from pursuing the claims now. *See Ibok v. Siac-Sector Inc.*, No. 05-Civ-6584, 2011 WL 293757 (S.D.N.Y. Feb 2, 2011).

Finally, the Complaint must be dismissed under FRCP 12(b)(3) because the Eastern District of New York is an improper venue. The Complaint contains a single conclusory statement with no factual support that "Venue is proper in this District pursuant 28 U.S.C. §1391." (sic) (*See* Complaint ¶82.) Because all of the defendants do not reside in the same State, §1391(b)(2) requires that venue be in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." Thus, to the extent this case is viable in any venue, it should be brought in the district in which Thomas' home is situated and where the foreclosure took place (i.e., the Southern District of Texas). This case bears absolutely no relationship to the Eastern District of New York, and should be dismissed accordingly.

Simply stated, Thomas has now filed essentially the same groundless lawsuit for the third time. And, upon review of Dolan Media's motions, this third lawsuit should end just as the first two have previously – dismissal of the Complaint.

Very truly yours,

W. Zachary Hughes

---

[6]    Although unclear from the Complaint, Thomas has previously indicated that she is bringing claims on behalf of others as a class action. *See, e.g.,* Complaint ¶497 ("The plaintiff and the class invoke the court's inherent powers..."). However, as a non-lawyer, Thomas is prohibited from representing the rights of others in a class action. Therefore, to the extent the Complaint seeks damages on behalf of anyone other than Thomas, the Court should dismiss the Complaint based on Thomas's inappropriate attempt to represent a class of injured plaintiffs.

cc:     Elizabeth Thomas (*pro se* Plaintiff)
        Jeff Stark, Counsel for Defendant Barrett Daffin

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Elizabeth Thomas, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil No.  H-10-4320 |
| | § | |
| Merscorp, Inc., et al, | § | |
| | § | |
| Defendant. | § | |

ORDER

Pursuant to the Notice of Voluntary Dismissal filed on April 28, 2011, the above-styled action shall be and is hereby dismissed without prejudice pursuant to Federal Rule of Civil Procedure 41(1)(A)(ii).

The Clerk shall send a true copy to all counsel of record.

Signed this **28** day of April, 2011.

_____
DAVID HITTNER
United States District Judge

# Exhibit  B

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION



**ENTERED**
04/29/2011

```
                              )
IN RE                         )
                              )
ELIZABETH THOMAS,             )    CASE NO. 10-40785-H3-7
                              )
          Debtor,             )
                              )
ELIZABETH THOMAS,             )
                              )
          Plaintiff,          )
v.                            )    ADV. NO. 11-3090
                              )
DOLAN MEDIA COMPANY, ET AL.   )
                              )
          Defendants.         )
```

ORDER

The court has <u>sua</u> <u>sponte</u> considered its subject matter
jurisdiction. The main bankruptcy case is closed. The instant
adversary proceeding does not arise in the Chapter 7 case, does
not arise under the Bankruptcy Code, and is not related to the
Chapter 7 case. Thus, this court lacks subject matter
jurisdiction under 28 U.S.C. § 1334. Accordingly, it is

ORDERED that the above captioned adversary proceeding
is dismissed.

Signed at Houston, Texas on this _____ **APR 2 8 2011**

day of _____, 2011.

LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE


Exhibit C

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION



**ENTERED**
**07/05/2011**

| | |
|---|---|
| IN RE | ) |
| | ) |
| ELIZABETH THOMAS, | )   CASE NO. 10-40785-H3-7 |
| | ) |
| Debtor, | ) |
| | ) |

ORDER

On the "Emergency Motion to Withdraw for Safety Concerns" (Docket No. 81), the following motions are withdrawn:

1.   Application to Pay Filing Fee in Installments (Docket No. 55).

2.   Motion to Reopen Bankruptcy Case (Docket No. 61).

3.   Emergency Motion to Transfer Venue (Docket No. 68).

4.   Emergency Motion to Transfer Venue (Docket No. 73).

SO ORDERED.

Signed at Houston, Texas on July 5, 2011.


_____
LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE



Exhibit  D

```
             UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
```

----------------------------X **Docket#**
ELIZABETH THOMAS,                : 11-cv-3656(JG)(RML)
            Plaintiff,           :
                                 :
    - versus -                   : U.S. Courthouse
                                 : Brooklyn, New York
MORTGAGE ELECTONIC               :
REGISTRATION SYSTEMS, INC.,      :
      et al,                     : January 10, 2012
            Defendant            :
----------------------------X

```
          TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
           BEFORE THE HONORABLE ROBERT M. LEVY
             UNITED STATES MAGISTRATE JUDGE
```

**A   P   P   E   A   R   A   N   C   E   S:**

**For the Plaintiff:**          **Elizabeth Thomas, Esq.**
                                41 Schermerhorn Street
                                #881
                                Brooklyn, NY 11201


**For the Defendant:**          **William Zachary Hughes, Esq.**
                                Baker Botts LLP
                                30 Rockefeller Plaza
                                New York, NY 10112

                                **Jeffrey Stark, Esq.**
                                Forchelli Law Group
                                333 Earle Ovington Blvd.
                                Suite 1010
                                Uniondale, New York 11553

**Transcription Service:**      **Transcriptions Plus II, Inc.**
                                3589 Tiana Street
                                Seaford, N.Y.  11783
                                Transcriptions2@verizon.net


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

1          THE COURT:  This is docket number 11-cv-3656,

2    Thomas v. Mortgage Electonic Registration Systems, Inc.

3          Will counsel please -- Ms. Thomas, are you on

4    the line?

5          MS. THOMAS:  Yes.  Yes, I am.

6          THE COURT:  Are you representing yourself in

7    this case?

8          MS. THOMAS:  Yes, I am.

9          THE COURT:  All right.  And who else is on the

10   line?

11         MR. STARK:  Jeff Stark of the Forchelli Curto

12   firm on behalf of the Barrett Daffin law firm.

13         THE COURT:  Okay.

14         Ms. Thomas, can you just start by explaining a

15   little bit what your case is about?

16         MS. THOMAS:  Well, my case is documentation.  I

17   am alleging that Barrett Daffin & Frappier is -- was

18   attempting to try to foreclose on my home by using

19   fraudulent documents, by using documents that they

20   created themselves; notices of default, notices of

21   assignments and all these documents are not part of my

22   mortgage file that they're, in fact, documents that they

23   made themselves as part of an art and science invention,

24   patent and copyrights that they have.

25         I'm alleging that they have created a network

1  where they have their own practices of collecting debt,

2  Barrett Daffin & Frappier law firm is a debt collector.

3  I'm alleging that through Dolan Media, using its

4  subsidiary and trade name, NDEX, they have orchestrated a

5  scheme to send out these notices where they make -- where

6  they led me to believe that they were from a attorney,

7  that an attorney was involved with my debt.  That there

8  was a procedure involved that an attorney had -- was

9  going to take a legal action against me.

10            When I started investigation where these

11 notices come from, I find out that these notices actually

12 come from Dolan Company because Barrett Daffin & Frappier

13 and other lawyers, certain other lawyers, have entered

14 into an agreement with Dolan Company.  Barrett Daffin &

15 Frappier sold Dolan Company, National Default Exchange,

16 which is an art and science procedure; it is an invention

17 of starting foreclosure and creating documents for a

18 foreclosure.  Barrett Daffin & Frappier in 2008 sold that

19 procedure to Dolan Company for $167 million under the

20 agreement that for twenty-five years, Barrett Daffin &

21 Frappier would refer notices, referrals to Dolan Company,

22 for them to start the foreclosure process.

23            And under those agreements, whenever a bank

24 servicer sends Barrett Daffin a referral that someone is

25 in default, Barrett Daffin and Frappier has agreed to

1  immediately send that referral to Dolan to start the

2  foreclosure process.  That's a little bit about my claim.

3          THE COURT:  Okay.  What does Barrett Daffin say

4  to that?

5          MR. STARK:  Well, first of all, we say that

6  we're not in New York and we're going to be making a

7  12(b)(2) motion in a time directed by the Court to

8  dismiss the lack of jurisdiction.

9          But I can give some background to Ms. Thomas'

10  situation.  She had a mortgage with Chase Home Finance

11  which went into default.  Under Texas law, there's a

12  procedure for the non-judicial foreclosure of a defaulted

13  mortgage under a power of sale which is granted in a deed

14  of trust and in Ms. Thomas' case, her deed of trust did

15  contain such a power of sale.

16          The procedure under Texas law for accomplishing

17  a non-judicial foreclosure includes: sending a notice,

18  accelerating the debt, which happened here.  Notifying

19  the -- Ms. Thomas of the date and scheduled time of the

20  sale which happened in this case and was scheduled to

21  occur on December 7, 2010.  Arranging for the notice of

22  sale to be posted and filed at the courthouse, which was

23  done here.  Prepared and recorded an appointment of a

24  substitute trustee, that issue is the focus of many of

25  the allegations in Ms. Thomas' complaint.  That is, the

1  power of the law firm to cause a substituted trustee to

2  be appointed.  But under Texas law, the substitution of

3  trustees are permitted and typical and the deed of trust

4  in Ms. Thomas' case, specifically authorizes the removal

5  and appointment of substitute trustees which happened

6  here.

7          MS. THOMAS:  Your Honor, I object because that

8  is not the substance of my complaint.

9          THE COURT:  Right.  Well, hold on just a minute

10 and let him finish and then you can have an opportunity

11 to explain why he's wrong.

12         MS. THOMAS:  Okay.  I'm sorry.

13         THE COURT:  Sure.

14         MR. STARK:  But in terms of the relationship of

15 the Barrett firm to the Dolan defendants, we're not the

16 same.  We, the law firm, contracts with the Dolan Company

17 on a per file or per service basis to provide various

18 administrative functions in connection with foreclosures

19 and we've done that here.

20         The intellectual property that is the focus of

21 some of Ms. Thomas' allegations are not owned by the

22 Barrett law firm.  So -- and we previously had

23 litigations with Ms. Thomas in Texas which -- in the

24 bankruptcy court.  By the way, the sale of her property

25 has, in fact, not taken place in part because of a

1  bankruptcy filing.

2       Ms. Thomas voluntarily discontinued that

3  litigation in Texas and then instituted this litigation

4  in New York.  But as we expect to show in our motion

5  papers, the Barrett law firm does no business in New York

6  and is not subject to the jurisdiction of the New York

7  court.

8       THE COURT:  Ms. Thomas, you wanted to clarify

9  something and then I'll hear from --

10      MS. THOMAS:  Yes, your Honor.  This litigation

11 is not about my home.  This -- I'm not coming to the

12 Court, asking the Court to make any decision of whether

13 they take that house or not.  It's not relevant to me any

14 longer at this point because no matter where I am -- and

15 the case in New York was not voluntarily dismissed.  I

16 had to dismiss it because the Barrett Daffin firm

17 threatened me.  I can't even stay in Texas because the

18 Barrett Daffin & Frappier law firm threatened me.

19      So, because of -- I fear for my safety, I came

20 home.  I was born and raised in New York.  So I came back

21 home to my family.  Barrett Daffin & Frappier continue to

22 send me mail in New York about my situation.  They

23 surrendered themselves to this jurisdiction.

24      Secondly, Barrett Daffin & Frappier are

25 shareholders of Dolan Company.  They filed as -- and

 1   they're sellers for Dolan.  They are connected as one.

 2   They file one Securities and Exchange Commission filing

 3   for their profit and their shareholders.  So they are

 4   connected to the Dolan Company in every sense of the

 5   word.

 6            But, your Honor, my complaint is that no matter

 7   what situation that I am in, whether default, not

 8   default, I am not bringing that issue before the Court

 9   because no matter what happens, it doesn't mean that a

10   lawyer should go make -- a lawyer can't make his own

11   evidence.  I don't know.  I've been talking to the

12   Attorney General in Nevada.  And as you know, I'm pro se.

13   I don't know the law.  I'm depending on the Court for the

14   law.  All I know is that in that situation in helping

15   with that investigation there, they say that a lawyer

16   cannot go out and make his own documents.  He cannot go

17   out and -- and the intellectual property that counsel was

18   alleging that Barrett Daffin & Frappier is not connected

19   to is not true.  They're shareholders of that property.

20   And that intellectual property, your Honor, is a

21   procedure where the law firm has created a statewide

22   organization of lawyers that have entered into an

23   agreement with Dolan Company to use this procedure to

24   foreclose.  Whether a loan is in default or not is not

25   the issue.  It's whether or not a lawyer can go and make

1    his own documents and use his -- and allow someone to use

2    his license to make these documents.

3            As the Court will discover, Dolan doesn't know

4    anything about my loan.  Dolan doesn't know anything

5    about the status of my loan.  How can Dolan Company put

6    me in default?  How can Dolan Company put -- send notices

7    out to me?  I made agreements to do these things with my

8    lender; yes.  I did.  I made agreements to make a -- if

9    anything happened, my lender could do -- take certain

10   actions against me.  It doesn't mean that a lawyer can

11   enter into agreements to allow someone to use their law

12   number and their signature to send out these notices and

13   when all -- nothing in the notices are true; nothing.

14   Nothing is true in it.

15           So that's my allegation but another thing, I

16   mean I don't want to get into legal terms about my case

17   as far as jurisdiction and those things because I'm not

18   experienced.  Had I been able to make my flight

19   yesterday, today I would have had counsel here.  I would

20   have had a lawyer here representing me on the case.  I

21   just needed to get -- I came here to get all my documents

22   that is voluminous.

23           And unfortunately, my flight yesterday, I just

24   couldn't make it.  They canceled one.  They canceled the

25   second and it got too hectic to even try to get onto

1  another.

2          But I do have an attorney I'm meeting with

3  tomorrow who will be making an appearance in this case to

4  argue jurisdiction, to argue those legal matters that are

5  far beyond my knowledge.

6          THE COURT:  When you say created documents,

7  what do you mean by that?

8          MS. THOMAS:  Well, your Honor, when I filed

9  this complaint, I also attached to it a patent and in

10 that patent, and I mean some of the stuff I did not -- I

11 did not produce to the Court because to be honest, I'm

12 afraid.  I mean, I don't want people seeing this stuff

13 and calling me and asking me about it but there is a

14 patent and in that patent, Barrett Daffin & Frappier had

15 -- is an assignee for an invention.  When I called the

16 United States Trademark, the United States Patent and

17 Trademark Association, I asked them what is a patent?

18 They told me a patent is just an idea.  It's an idea made

19 real.

20         So, Barrett Daffin & Frappier took this idea

21 from an invention and they created their own method of

22 foreclosure.  For example, you see that in an electronic

23 way, in a paperless fashion, Barrett Daffin & Frappier,

24 Dolan Company is a wireless electronic office for

25 lawyers.  They become their back office; wireless when

1  they get these referrals.

2          But more importantly is that it shows a

3  documented procedure for starting foreclosure.  As a

4  matter of fact, if I submit it and I hope to with the

5  assistance of the Attorney General in Nevada, if I submit

6  this, the grand jury minutes of the notaries that pled

7  guilty and testified there, you'll see that these

8  notaries talked about how these -- they're just notaries.

9  They just sit down at a computer and search for the

10 beneficiary on people's mortgages that a servicer is

11 alleging is in default.  Once they see who the current

12 beneficiary is, then they do an assignment.  On every

13 foreclosure there's always an assignment to someone else.

14          And I'm saying that if there is an assignment,

15 it can't be done by a procedure.  Most of these notaries

16 don't know nothing.  They don't know about loans.  They

17 don't know nothing about the mortgage business.  They

18 don't know anything.  They're just following at patent.

19 That patent is in -- I submitted to the Court as my

20 evidence.  That patent shows documented that how they

21 create their own documents necessary for foreclosure.

22          For example, if I submit to the Court my --

23 what a lawyer is saying is my loan file versus the

24 document Barrett Daffin & Frappier used, you'll see that

25 those documents don't look anything alike.  Where did

1   Barrett Daffin & Frappier and them get those documents

2   from?  I don't know but my loan file, according to

3   another lawyer, came with assignments.  And an assignment

4   was to a different bank than Barrett Daffin & Frappier

5   assigned my loan to.

6          How does Barrett Daffin & Frappier know who I

7   owe money to?  How do they know?  There's people more --

8   there's experts that's trying to figure out who owns

9   these loans.  Well, that's not an excuse for anyone not

10  to pay but I have experts that's really -- I will have

11  experts lined up that's willing to come to the Court to

12  testify about the importance of certificate holders, how

13  they're not getting their money.  How they would like to

14  set up a fund where people who are not paying can pay

15  these lawyers that their money could go to certificate

16  holders, where it belongs to, instead of a bank servicer.

17  Chase has gotten paid so many -- how many times have I

18  got to pay Chase?

19          THE COURT:  Uh-huh.

20          MS. THOMAS:  So, I mean there's a lot of

21  allegations here in my complaint --

22          THE COURT:  Okay.

23          MS. THOMAS:  -- but the most important one

24  focuses on they went to the United States Patent and

25  Trademark Commission and to a copyright and they made up

 1  their own procedures for foreclosure.  They hired people.
 2  They used temporary agency and hired people who don't
 3  know anything, anything about people mortgages and these
 4  people stayed in an office around the clock, just
 5  assigning people mortgages.  There's four notaries.
 6           THE COURT:  Okay.  I think I understand your
 7  claim and I have Mr. Hughes -- Mr. Hughes?
 8           MR. HUGHES:  Yes, your Honor.
 9           THE COURT:  -- has been waiting here patiently.
10  I'm just going to give him an opportunity to speak as
11  well.
12           MR. HUGHES:  Okay.  And I don't have, frankly,
13  a whole lot to add substantively.  My client, I represent
14  a couple of the defendants here or several of the
15  defendants here, Dolan Media being the parent company.
16           Dolan's business is -- has a variety of aspects
17  to it.  The one aspect of it is this kind of foreclosure
18  services, where their clients are law firms such as the
19  one involved here, who really use Dolan and the software
20  that it has acquired in order to meet the foreclosure
21  requirements in a variety of states.  Notably New York is
22  actually not one of them but Texas certainly is which is
23  where this dispute, I guess, arose from.
24           Again, substantively I don't really have much
25  to add here.  Just procedurally again to kind of pick up

1  where Mr. Stark had alluded to, Ms. Thomas did originally

2  file her case in the Southern District of Texas.  There

3  were actually two different lawsuits.  One was filed in

4  the Bankruptcy Court in the Southern District of Texas

5  related to the bankruptcy action that she had started in

6  that forum.  That case was dismissed because her

7  bankruptcy case had already been closed.

8         The second case was then just filed in the

9  District Court in the Southern District of Texas.  We got

10  -- we received a complaint, very similar to the one we

11  have here, obviously a very lengthy one with some of the

12  allegations that Ms. Thomas has outlined.  Our position

13  was that that complaint had not stated a claim that was

14  actionable and we filed a 12(b)(6) motion.  Before that

15  motion could be heard, Ms. Thomas dismissed the suit.

16         We thought that was the end of the matter and

17  then several months later, the case got refiled here in

18  the Eastern District of Texas -- Eastern District of New

19  York, excuse me.  I'm operating from a bit of a handicap

20  myself because I myself just moved here from Houston.  So

21  that makes two of us, Ms. Thomas and myself and this

22  lawsuit -- I guess that makes three of us that have moved

23  from Houston to New York.

24         In any event, so I think where we find

25  ourselves now and I've had several conversations with Ms.

1   Thomas.  I think they've all been very collegial in

2   trying to move the ball forward.  Where I see -- how I

3   see the case positioned at this point is we just need to

4   determine whether the complaint that's on file is the

5   complaint she's going forward with.

6           In several of our discussions she's alluded to

7   doing one of two things, neither of which are mutually

8   exclusive which is hiring counsel to assist her here

9   and/or amending her complaint.

10          And it's just been our position that we need to

11  kind of figure out what the allegations are, figure out

12  if she is going to hire counsel to assist her or not and

13  then whatever decision she makes on that we're ready to

14  proceed accordingly, but at least as the complaint stands

15  now, quite frankly, we're going to file a very similar

16  motion to what we filed in the Southern District of

17  Texas.

18          We're trying to determine, frankly, whether we

19  have similar jurisdictional arguments that Mr. Stark

20  alluded to for his clients.  But in any event, it would

21  at least be a 12(b)(6) motion as things currently stand.

22          THE COURT:  And who is MERS Corp.?

23          MR. HUGHES:  That is a question that I'll have

24  to defer to Ms. Thomas because they are not affiliated

25  with Dolan Media Company and --

1    MS. THOMAS:  MERS Corp. is a shareholder, is

2  the owner of MERS Electonic Registration System.

3    THE COURT:  Okay.  Now I recall about a month

4  or two ago, Ms. Thomas, you were looking for a change of

5  venue, but you no longer want to do that; correct?  You

6  want to stay here in Brooklyn?

7    MS. THOMAS:  Your Honor, I mean right now I

8  think that's the best thing.  I've talked to several

9  experts and we're still trying to discern whether -- I

10  don't see the difference.  Well, I'm from New York, so

11  for me, I don't see the difference between Brooklyn and

12  New York but I guess from someone from the outside

13  traveling in accommodations, it may be different.  And,

14  you know, at the same time which I guess that all depends

15  on whether I survive a motion to dismiss.

16    THE COURT:  Okay.  Mr. Stark, are you looking

17  for a motion to dismiss and Mr. Hughes, you're both

18  looking to move to dismiss at this point?

19    MR. STARK:  Well, I leave it in part to Ms.

20  Thomas and the Court.  That is to say, I would be

21  surprised if a new -- if a lawyer came in and wanted to

22  amend the complaint, I don't think that would affect the

23  question of whether the Court had jurisdiction over my

24  client.

25    MS. THOMAS:  Right.

1       MR. STARK:  It might be that a lawyer who took

2   a close look at this would advise Ms. Thomas that there

3   was no jurisdiction in New York and save us a motion.

4   But --

5       MS. THOMAS:  (Indiscernible).

6       MR. STARK:  -- I can go either way.  I could

7   either wait for Ms. Thomas to have a lawyer come in and

8   either talk -- and have a chat with that lawyer to see

9   whether the motion was required or, you know, we're

10  prepared to make a motion in a couple of weeks if the

11  Court wants us to.

12      MR. HUGHES:  And I would say our position is

13  very similar.  I mean, we're prepared to move forward

14  today and file our motion within the next two or three

15  weeks or if Ms. --

16      MS. THOMAS:  (Indiscernible).

17      MR. HUGHES:  -- Thomas wants more time or the

18  Court deems that appropriate for her to better evaluate

19  her case in the context of perhaps trying to find an

20  attorney, we're happy to give that time, as well.

21      THE COURT:  Okay.

22      MS. THOMAS:  No, your Honor.  I don't need it.

23  I think you know, getting them to answer the complaint

24  would be great.  I mean they've had it since October.

25  They're going to move to dismiss.  I'm getting an

1  attorney, whether they feel I have jurisdiction or not, I

2  don't think it's going to matter.  I've spoken to an

3  attorney and we don't see a jurisdiction issue.  So, they

4  can just go ahead with their motion to dismiss.

5          THE COURT:  Well, Mr. Hughes, you're not moving

6  to dismiss on jurisdictional grounds, are you?

7          MR. HUGHES:  I don't believe so.  We're

8  evaluating that but I think candidly, we probably don't

9  have the same personal jurisdiction argument that

10 Mr. Stark does for his clients.  But we may also be

11 looking at a venue issue.  So, you know, there are a

12 couple of things we're looking at but primarily, it would

13 be a 12(b)(6) motion.

14         THE COURT:  Okay.  So, Ms. Thomas, you're

15 saying that at this point you will not be getting an

16 attorney until the motions are filed and then at that

17 point, you'd be evaluating?

18         MS. THOMAS:  No, your Honor, that's not what

19 I'm saying.

20         THE COURT:  Okay.

21         MS. THOMAS:  One of the things I spoke with the

22 lawyer and the RICO expert is -- was about jurisdiction

23 and whether or not these defendants, whether there would

24 be a jurisdiction issue.  I mean, as an American citizen,

25 I have to be able to go to court somewhere, your Honor.

1   You know, I mean if I am not doing anything disrespectful

2   before the Court or disrespectful to my defendants, I

3   certainly as far as I know, still have a right to bring

4   an issue before a judge and let a judge decide it.

5   Twice, your Honor, they have prevented and stopped me

6   from going to court.  If you look at the reasons why

7   these issues was dismissed in bankruptcy, you'll see that

8   the judge ordered all my motions pending before her,

9   withdrawn without prejudice due to safety concerns.  My

10  case before the southern district court,

11  Judge Hitner (ph.), had to be removed, dismissed, due to

12  safety concerns.  So I mean, if I file a complaint

13  (indiscernible) --

14          THE COURT:  Whose safety -- I'm sorry, whose

15  safety concerns?  The concerns of your safety or the

16  concerns of others?

17          MS. THOMAS:  The safety -- my safety concerns

18  and my family.  I mean, we're afraid.  We're afraid.  So,

19  I mean if I file a complaint that doesn't disrespect

20  anybody in a personal way, I didn't -- even in my

21  complaint here, I didn't say anything personal.  I mean,

22  I tried, if I did, it wasn't intentional.  I filed a

23  complaint.  I have an issue.  I would like a judge, not a

24  lawyer, I would like a judge to just hear my case and

25  decide my issue.  I don't think I should have to be

1    afraid.  I don't think someone should be calling me on

2    the phone threatening me, telling me I better consider

3    sanctions that I can suffer, me and my family can suffer

4    outside of the ones the Court can give me.  What kind of

5    sanctions me and my family can suffer outside the one a

6    court could give me for filing a complaint?  What?

7           So now I can't go to bankruptcy court in Texas.

8    Now I can't go to federal court in Texas.  Now I have to

9    be on the run like a thief because I can't stay in my

10   home because we're afraid.  Every little noise, every

11   little this.  What are they going to do, you know?

12   Because I have this information, because I have this --

13   so I came home.  I was born and raised in New York.  I

14   only moved -- I only lived in Texas four years.  I was

15   born and raised in New York in the Bronx.  So I came home

16   with the remainder of my family.  Even there, I don't

17   feel comfortable because I don't want to bring them any

18   hardship.  So I filed the complaint here because where

19   else I'm going to go now?  Where else I'm going to go

20   now?  So now they're going to argue I don't have

21   jurisdiction.  Now they're going to argue that -- they

22   send me mail there.  They correspond with me in New York.

23          I'm alleging a statewide RICO claim -- case, at

24   least one of my defendants are located in New York, which

25   is Chase Manhattan.  I -- and as long as I have one

1  defendant there, I believe that there's a jurisdiction

2  issue.  And even if it's not, that's for the Court to

3  decide.

4         THE COURT:  All right.  So, at this point,

5  everyone seems ready to have this motion decided; is that

6  correct?

7         MS. THOMAS:  Yes.  And by tomorrow, your Honor,

8  I will have counsel.  Like Is aid, if I would have made

9  it to New York yesterday, I would have -- I came -- one

10 of the reasons why I was here in Texas was getting all my

11 documents but I couldn't get a flight.  They was -- we

12 was on for Tornado watch yesterday.

13        THE COURT:  Okay.

14        MS. THOMAS:  They canceled my flight.  They

15 didn't delay it, they canceled it.

16        THE COURT:  Right.  And who is -- do you know

17 who your attorney will be?

18        MS. THOMAS:  I'm -- Ms. Pipagorro (ph.) .  I've

19 already spoken to both -- to Mr. Hughes and Mr. Stark

20 about her.  So, I just needed to get my documents to her

21 and go over them with her.

22        THE COURT:  Okay.

23        MS. THOMAS:  That's what I need and I will be

24 doing that tomorrow.

25        THE COURT:  All right.  And then she'll need to

1  file a --

2          MS. THOMAS:  (Indiscernible).

3          THE COURT:  I'm sorry.  She'll need to file a

4  notice of appearance.

5          MS. THOMAS:  Yes, she will.

6          THE COURT:  Okay.  And when do you think she'll

7  do that by, by the end of the week?

8          MS. THOMAS:  Yes.  Yes, your Honor.

9          THE COURT:  Okay.

10          MS. THOMAS:  But I don't want that to prevent

11  the defendants to go ahead with their motion to dismiss.

12          THE COURT:  Well, I think Judge Gleeson will

13  probably want to have a premotion conference, if you're

14  represented.

15          MS. THOMAS:  Oh.

16          THE COURT:  You know, just to discuss the

17  issues but again, that's -- we'll wait and see.  If your

18  attorney is going to file a notice of appearance by the

19  end of the week, then I think counsel should write

20  premotion conference letters to Judge Gleeson.  Just

21  check his rules and make sure they're required in this

22  situation but I think they are.

23          MS. THOMAS:  Okay.

24          THE COURT:  Okay?  Mr. Stark, does that sound

25  right to you?

1          MR. STARK:  Yes.

2          THE COURT:  Okay.  Mr. Hughes?

3          MR. HUGHES:  Sure.

4          THE COURT:  Okay.  So I think that's where

5    we'll proceed from here.  And Ms. Thomas, your lawyer

6    will file the notice of appearance, both of the

7    defendant's attorneys will file their premotion

8    conference letters and then Judge Gleeson will instruct

9    you all what to do next.

10         MS. THOMAS:  Okay.

11         THE COURT:  Okay?  Now, I would expect -- it

12   probably makes sense for the premotion conference letters

13   to come some time next week, if -- I wouldn't file them

14   -- I don't know when you were planning to file them but I

15   would not file them before the notice of appearance has

16   been filed because I believe his rules do not require a

17   premotion conference where there's a pro se.

18         MR. HUGHES:  I believe that's correct.

19         MR. STARK:  I think that's correct.

20         THE COURT:  Right.  So, Mr. Stark, when would

21   you like to file your premotion conference letter?

22         MR. STARK:  Oh, let me say -- why don't we say

23   next Friday, so that Ms. Thomas' lawyer has a chance to

24   review the documents and then put in her notice of

25   appearance.

1          THE COURT:  Okay.

2          MR. HUGHES:  That's fine.  I don't have a

3    calendar in front of me though.  What -- do you have a

4    date on that, Jeff?

5          MR. STARK:  Yes, that's the 20th, I think.

6          THE COURT:  20th.  Okay.

7          MR. HUGHES:  And I guess my only question would

8    be in the eventuality we don't get a notice of appearance

9    this week, then what is our next step?

10          MS. THOMAS:  Motion to dismiss.

11          THE COURT:  Yes.  Are you certain, ma'am, that

12    you're going to have an attorney?

13          MS. THOMAS:  I mean, I am hoping to come to

14    agreements with her on certain things.  I mean, until I

15    get it written -- I know there's a strong interest there

16    with her and, you know, but --

17          THE COURT:  Okay.

18          MS. THOMAS:  -- until we go over all the

19    documents, your Honor, I don't want to say that I have

20    one and then something happens and we don't come to an

21    agreement, you know?  This is -- to me, this is a case

22    about lawyers.  I'm going to -- obviously, I'm going to

23    have to defer to her legal advice and that's something

24    I'm prepared to do.  I'm not a lawyer.  I mean, she is.

25    So legally, whatever she recommends is what I'm willing

1  to abide by.

2          THE COURT:  Okay.  So for example, if she says

3  she does not think you have jurisdiction over Mr. Stark's

4  client, would you follow that view or would you proceed

5  on your own?

6          MS. THOMAS:  I will follow that view but that

7  was one of the first things that she looked at was the

8  jurisdiction issue.  And that was one of the first things

9  she put to one of her counsels who only do RICO cases,

10  what's the jurisdiction issue.  So I guess that

11  jurisdiction issue is going to be a matter for the court.

12          It's the other -- the complicity of it for her,

13  your Honor, is she's not an intellectual attorney, as far

14  as patents and copyrights and all those things are

15  concerned.  Those are the things that I really have to

16  get to her for her to get advice on.  So, everything else

17  is not of issue.

18          THE COURT:  Well, Mr. Stark, do you think it

19  makes sense to file the premotion conference letter

20  either way next Friday and then if it turns out that

21  she's pro se, to just go ahead with the briefing

22  schedule, let Judge Gleeson make the decision or do you

23  want to hold up?

24          MS. THOMAS:  Let's just --

25          THE COURT:  Okay, you know, you could just put

1  a note in the first paragraph of your letter saying that

2  we had this conference today and that Ms. Thomas is

3  planning on hiring an attorney and then leave it at that.

4           MR. STARK:  Yes.

5           THE COURT:  You know, just whatever you think

6  makes sense.

7           MR. STARK:  That's good.

8           THE COURT:  Okay?

9           MR. STARK:  Yes.

10           THE COURT:  Anything else?

11           MR. HUGHES:  Nothing else from me, your Honor.

12           THE COURT:  All right.  Ms. Thomas, anything

13  else?

14           MS. THOMAS:  No, your Honor, nothing else for

15  me.

16           THE COURT:  Mr. Stark?

17           MR. STARK:  Not a thing.

18           THE COURT:  Okay.  Thank you very much.

19           MR. STARK:  All right.  Nice to talk to you

20  again, Ms. Thomas.

21           MS. THOMAS:  Thank you.  Thank you.

22           MR. HUGHES:  All right.  Thank you.

23           THE COURT:  Bye.

24               (Matter concluded)

25                    -o0o-

#### C  E  R  T  I  F  I  C  A  T  E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **18th** day of **January**, 2012.

Linda Ferrara
Transcriptions Plus II, Inc.